John C. Longmire
(A Member of the Firm)
Lauren C. Cohen
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

Bidding Procedures Hearing Date: December __, 2008 at 10:00 a.m.
Bidding Procedures Objection Deadline: December __, 2008 at 4:00 p.m.
Sale Hearing Date: January 8, 2009 at 10:00 a.m.
Sale Objection Deadline: January 5, 2009 at 4:00 p.m.

Attorneys for Debtors and Debtors In Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Value City Holdings, Inc., <u>et al.</u>, | : | Case No. 08-14197 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-----------------------------------------------------x

**DEBTORS' MOTION FOR ORDERS (I) (A) ESTABLISHING AUCTION
AND BID PROCEDURES FOR THE SALE OF THE DEBTORS' INTERESTS IN THEIR
REMAINING LEASES, (B) APPROVING CERTAIN BID PROTECTIONS, (C) FIXING
FORM AND MANNER OF NOTICE OF THE AUCTION, (D) ESTABLISHING
PROCEDURES FOR SETTING CURE AMOUNTS, AND (E) SCHEDULING A SALE
HEARING TO CONSIDER THE SALE OF THE DEBTORS' INTERESTS IN THEIR
REMAINING LEASES; (II) APPROVING AND AUTHORIZING THE SALE OF THE
DEBTORS' INTERESTS IN THEIR REMAINING LEASES TO SUCCESSFUL
BIDDERS FREE AND CLEAR OF ALL LIENS, INTERESTS,
<u>CLAIMS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF</u>**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"<u>Debtors</u>"), by and through their undersigned counsel, hereby submit this motion (the "<u>Motion</u>")

seeking, pursuant to sections 105, 363 and 365 of title 11 of the United States Code, (the

"<u>Bankruptcy Code</u>"), and rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>") entry of (I) an order, substantially in the form attached

hereto as <u>Exhibit A</u>, (the "<u>Bidding Procedures Order</u>") (a) establishing auction and bidding

procedures, in the form annexed hereto as <u>Exhibit B</u> (the "<u>Bidding Procedures</u>"), to sell the

Debtors' interests in their remaining unexpired nonresidential real property leases (including any

personal property that the Debtors determine to sell with such interests, the "Leases"),[1] (b) approving certain bid protections to a Stalking Horse Bidder (as defined below), if applicable, (c) fixing the form and manner of notice of the Bidding Procedures, the Auction (as defined below) and the Sale Hearing (as defined below), (d) establishing procedures for setting cure amounts (the "Cure Procedures"), and (e) scheduling a Sale Hearing to consider lease assignments or lease termination agreements with the parties providing the highest or best offers received by the Debtors pursuant to the Bidding Procedures; and (II) an order substantially in the form attached hereto as Exhibit G (the "Sale Order") (a) approving and authorizing the sale of the Leases pursuant to one or more assumption and assignment agreements, substantially in the form annexed hereto as Exhibit D (an "Assumption and Assignment Agreement"), or entry into one or more lease termination agreements, substantially in the form annexed hereto as Exhibit E (a "Lease Termination Agreement") pursuant to the terms and conditions stated herein, (b) establishing cure amounts, and (c) waiving the ten (10) day stay provided for under Bankruptcy Rules 6004(h) and 6006(d).  In support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## **PRELIMINARY STATEMENT**[2]

1.       As this Court is aware, prior to the Petition Date, the Debtors began store closing or "Going-Out-Of-Business" sales at all of their stores.  Prior to initiating the GOB Sales, the Debtors made several attempts to reorganize their business and to reduce the business to a core group of stores.  As part of their restructuring efforts, the Debtors, with the help of their real

---

[1]      A non-exclusive schedule of the Leases and their respective Cure Amounts (defined herein) is attached hereto as Exhibit C.

[2]      Capitalized terms used in this section shall have the meanings ascribed to them below.

estate advisors, marketed all of their interests in their real property leases. Through this process, the Debtors reduced the number of their stores by almost half and successfully assigned a large majority of those leases to interested buyers. However, a number of the Debtors' stores were closed prepetition and their leases, though extensively marketed, did not receive any interest from potential buyers. Accordingly, upon the commencement of these cases, the Debtors rejected a majority of those leases.

2.      Also, following the commencement of these cases, the Debtors determined to retain Hilco Real Estate, LLC ("Hilco") to assist them with the evaluation of their leases and to market and assist the Debtors with the sale of any leases that may realize additional value for these estates. Since the Petition Date, the Debtors have also completed GOB Sales at approximately 29 of the Debtors' 66 stores that were open on the Petition Date. In connection with those store closings, the Debtors sought the advice of their prepetition and postpetition real estate advisors to determine whether there was any additional value that could be achieved for these estates through the assignment of those leases. The Debtors, upon consultation with Hilco, the Committee, and Agent for the Debtors' prepetition and postpetition lenders (the "DIP Agent"), determined in their business judgment that the costs to these estates of maintaining rent and other administrative obligations associated with marketing those approximately 29 leases for even a short period of time significantly outweighed any benefits that could be achieved through any postpetition marketing efforts. Accordingly, the Debtors rejected those leases.

3.      However, the Debtors, in consultation with Hilco, have determined that there may be an opportunity for the Debtors to capture additional value from the sale of their remaining Leases. In order to achieve the highest and/or best offers for the sale of the Leases, the Debtors seek approval of the procedures set forth herein. The Debtors believe that the Bidding

Procedures and Cure Procedures set forth below present the best opportunity for the Debtors to maximize value for these estates and their creditors from the sale of the Leases. Accordingly, the Debtors seek approval of the procedures set forth below and the sale of the Leases to the Successful Bidders and Next Highest Bidders, as applicable.

## JURISDICTION

4.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code, as complemented by Bankruptcy Rules 2002, 6004 and 6006.

## GENERAL BACKGROUND

5.      On October 26, 2008 (the "Petition Date"),[3] each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

6.      On November 3, 2008, the United States Trustee of the Southern District of New York (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").

7.      The Debtors operate a full-line, value-price retailer carrying men's, women's and children's apparel, accessories, jewelry, shoes, home fashions, electronics and seasonal items.

---

[3]     Retail Ventures Jewelry, Inc. and VCHI Acquisition Company filed petitions for relief under chapter 11 of the Bankruptcy Code on October 27, 2008.

The Debtors (and their predecessors) have operated stores in the Midwest, Mid-Atlantic and Southeastern United States for over 80 years. The Debtors' stores have traditionally been filled with a wide assortment of designer, department, discount and specialty store deals at prices substantially lower than competing department and discount stores. Prior to the Petition Date, the Debtors initiated a liquidation of their remaining merchandise and inventory through store closing, liquidation, or other promotional sales (the "GOB Sales").

8.      As of August 31, 2008, the Debtors recorded total assets of approximately $139 million and total liabilities of approximately $160 million. For the seven months ended August 31, 2008, the Debtors recorded total revenue of approximately $289 million.

## RELIEF REQUESTED

9.      The Debtors have determined that implementing certain procedures to sell the Leases will enable the Debtors to realize the maximum value for these Leases. Accordingly, the Debtors are seeking the entry of two orders, pursuant to sections 105, 363 and 365 the Bankruptcy Code, as complemented by Bankruptcy Rules 2002, 6004 and 6006:

(a)     at a hearing (the "Bidding Procedures Hearing"), entry of the Bidding Procedures Order, (a) establishing the Bidding Procedures for the sale of the Debtors' Leases, (b) approving certain bid protections to a Stalking Horse Bidder, if applicable (c) fixing the form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing (d) establishing the Cure Procedures, and (e) scheduling a hearing (the "Sale Hearing") to consider the entry of the Sale Order; and

(b)     at the Sale Hearing, entry of the Sale Order (a) approving and authorizing the sale of any or all of the Debtors' Leases pursuant to an Assumption and Assignment Agreement or Lease Termination Agreement, (ii) establishing cure amounts, and (iii) waiving the ten (10) day stay provided for under Bankruptcy Rules 6004(h) and 6006(d).

## A.      Sale of the Leases Pursuant to an Auction

10.     Under Bankruptcy Rule 6004(f)(1), the sale of property outside the ordinary course of business may be by private sale or by public auction. See Fed. R. Bankr. P. 6004(f)(l).

The sale of the Leases through a public auction process (with a reservation of the Debtors' right to withdraw any or all of the Leases from the Auction or to proceed with a private sale of any or all of the Leases) will enable the Debtors to obtain the highest and best offers for the Leases, and to maximize value for these estates and their creditors.

**B.**     **Proposed Bidding Procedures**

11.     The Debtors are proposing the Bidding Procedures in an effort to maximize the realizable value of the Leases for the benefit of the Debtors' estates, creditors and other interested parties.  The Bidding Procedures contemplate an auction process pursuant to which the sale of the Debtors' Leases will be subject to higher or better offers.  However, the Debtors, in consultation with Hilco, reserve the right to remove any Lease from the Auction if, in the exercise of their business judgment, they believe that value may be maximized through a private sale, termination, or rejection, of the relevant lease.

12.     The Debtors request that the Court approve the Bidding Procedures substantially in the form attached hereto as Exhibit B:[4]

(a)     **Participation Requirements**:  Any person that wishes to participate in the bidding process (a "Potential Bidder") must become a "Qualified Bidder." As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver (unless previously delivered) to the Debtors:

(i)  The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of a Sale Transaction (as defined below), (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their counsel and (y) the written commitment acceptable to the Debtors and their counsel of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in

---

[4]     The following is intended to be a summary of the proposed Bidding Procedures only, and is qualified in its entirety by the Bidding Procedures themselves.  In the event of any inconsistency between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall control.

4629511_1.DOC

connection with a Sale Transaction.  In the event that a Potential Bidder is unable to provide Financials, the Debtors may, in their discretion, accept such other information sufficient to demonstrate to the Debtors' satisfaction that such Potential Bidder has the financial wherewithal to consummate a Sale Transaction.  Landlords may be exempted from the requirement to provide Financials.

A "Qualified Bidder" is a Potential Bidder whose Financials or other information demonstrate the financial capability to consummate the Proposed Sale (a "Sale Transaction") and which the Debtors determine, in their discretion, is reasonably likely to make a bona fide offer that would result in greater value being received for the benefit of the Debtors' creditors.

(b) **Required Bid Documents**:  All bids must include the following to constitute a Qualified Bid (the "Required Bid Documents"):

(i)  A written irrevocable offer, if submitted by counsel to such bidder, on the letterhead of such bidder's counsel, that expressly states the terms of the offer, including the purchase price being offered for each individual Lease (if more than one Lease) in the form of an allocation schedule.  Any offer must include: (a) the full name and identity of the bidder; (b) the full name and identity of the bidder's broker (if any); (c) the intended use of such premises; and (d) an express statement that the bidder has read, understands, and agrees to be bound by and comply with the Bidding Procedures.  The foregoing shall apply to all bids made by any bidder or on behalf of any bidder by a broker.

(ii)  An executed and fully completed copy of the Assumption and Assignment Agreement, annexed hereto as Exhibit D or Lease Termination Agreement, annexed hereto as Exhibit E, as applicable, and a blacklined copy of the executed Assumption and Assignment Agreement or Lease Termination Agreement, as applicable, for the Lease(s) marked against the respective Assumption and Assignment Agreement or Lease Termination Agreement and initialed to show those amendments and modifications (including for example, price and terms) that the bidder proposes (each a "Marked Agreement"), signed by an individual authorized to bind the proposed bidder; provided, however, that any such amendments or modifications shall not be materially more burdensome than the terms of the Assumption and Assignment Agreement or Lease Termination Agreement, as applicable.  Copies of the Assumption and Assignment Agreement and Lease Termination Agreement are annexed hereto as Exhibits D and E, respectively.  Additional copies may be obtained by written request to:  Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: John C. Longmire, Esq. (Fax No.: (212) 728-8111, or email: jlongmire@willkie.com).

(iii)  In the case of a real estate broker bidding on a Lease as agent for a bidder, the broker must submit the Required Bid Documents together with a letter of authorization on the bidder's corporate letterhead, executed by an authorized officer of the bidder, stating that: (x) the bidder exclusively authorizes the broker to submit such offer on behalf of the bidder and that any commission or fee of any type due and payable to such broker as a result of an assignment of any Lease shall be paid solely by the bidder and the bidder shall indemnify the Debtors, their estates, the Committee, and Hilco in this regard, and (y) the bidder acknowledges that it will comply with these Bid Procedures.

(iv)  In the case of a landlord bidding on a Lease to which such landlord is a party (a "Landlord Bid"), a written offer on the landlord's corporate letterhead, for the purchase of one or more of the Leases that must include the gross amount offered for each individual Lease (if more than one Lease) including that portion which is payable in cash to the Debtors and that portion, if any, which is a "credit bid" consisting of a waiver of cure amounts and rejection damages.  Such written offer must expressly state that the landlord's offer is irrevocable until the earlier of: (x) the closing of the Sale Transaction, and (y) fourteen (14) days following the Auction, and the extent to which the landlord agrees to waive and release any and all claims it may have against the Debtors, including claims pursuant to section 502(b)(6) of the Bankruptcy Code.

(v)  A certified check, made payable to the Debtors, representing a good faith deposit, in the total amount of at least 10% of the purchase price (the "Deposit").

(vi)  Written evidence of the bidder's financial ability to purchase the Lease(s) in whole, which, in the Debtors' sole discretion, evidences the bidder's ability to timely consummate the Sale Transaction and perform under the Marked Agreement, including, without limitation, (x) federal tax returns for two years and/or current audited or reviewed financial statement and/or bank account statements, (y) a description of the intended use of the premises subject to the Lease(s), and (z) any additional information that the Debtors may reasonably request.

(vii)  "Package" bids for multiple leases (or designation rights) for the Leases will be considered but shall be subject to competitive bids from (a) other package bids, and (b) individual bids for such Leases.

(viii)  Written evidence that the bidder has obtained authorization and approval from its Board of Directors (or comparable governing body) with respect to the submission of its bid and execution of the Marked Agreement, or a representation that no such authorization or approval is required.

(c)    **Qualified Bids**:  A "Qualified Bid" is a bid that includes each of the Required Bid Documents and:

(i)  is a binding irrevocable offer to purchase the Lease(s) for cash only, or if a Landlord Bid, Cash and/or Credit Bid, with no contingencies to closing (other than the conditions set forth in the Assumption and Assignment Agreement or Lease Termination Agreement, as applicable);

(ii)  has been timely received by each of the parties listed in paragraph D below, no later than the Bid Deadline or any extended Bid Deadline;

(iii)  is not materially more burdensome or conditional than the terms of the Assumption and Assignment Agreement or Lease Termination Agreement, as applicable, and, in the Sellers' business judgment, is likely to be able to close;

(iv)  establishes that the bidder has the ability to consummate its proposed transaction within the time frame contemplated for consummation of the Assumption and Assignment Agreement or Lease Termination Agreement, as applicable;

(v)  is not subject to or conditioned on obtaining financing;

(vi)  is not conditioned on the outcome of unperformed due diligence;

(vii)  does not entitle the bidder to any termination or break-up fee, expense reimbursement, or similar type of payment;

(viii)  is a good faith, bona fide offer to purchase the Lease(s);

(ix)  is not inclusive of any amount anticipated to be owed for taxes which may be due on account of the transfer contemplated by such bid;

(x)  by its terms will remain open and irrevocable until the earlier of: (i) the closing with respect to the Successful Bid or the Next Highest Bid (each as defined below), as applicable; and (ii) fourteen (14) days after entry of the Sale Order; and

(xi)  contains evidence satisfactory to the Sellers that the bidder is reasonably likely to obtain prompt regulatory approval, if any is required, to purchase the Lease(s).

The Debtors reserve the right to reject any and all bids for a particular Lease and/or remove any Lease(s) from the Auction if the Debtors, after consultation with the Committee, determine that such action will maximize value for the Debtors' estates.

(d)    **Bid Deadline**:  The deadline for submitting bids by a Qualified Bidder shall be January 5, 2009, at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").  Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid must deliver written copies of its bid to:  Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: John C. Longmire, Esq., with copies to: (i) Hilco, 5 Revere Drive, Suite 320, Northbrook, IL 60062, Attn: Ross Block (ii) counsel to the Official Committee of Unsecured Creditors, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, NY 10169, Attn: Glenn B. Rice, Esq. and (iii) the Debtors, 3241 Westerville Road, Columbus, OH 43224, Attn: Stephen B. Darr, Chief Financial Officer.

(e)    **Auction**:  If a Qualified Bid by a Qualified Bidder is received by the Bid Deadline, an auction (the "Auction") with respect to a Sale Transaction may take place two (2) business days prior to the Sale Hearing **at 10:00 a.m. (prevailing Eastern Time)** at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, or such other place and time as the Debtors notify all Qualified Bidders, the Committee, and other invitees.  If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held.

(i)  In the event the Debtors receive only a single Qualified Bid for a particular Lease or group of Leases, such Lease(s) may not be subject to bidding at the Auction, and the Debtors may seek to assume and assign such Lease(s) at the Sale Hearing if such Qualified Bid is otherwise acceptable to the Debtors, after consultation with the Committee.  Similarly, the Debtors reserve the right to remove any Lease from the Auction if, in their business judgment, they believe that value may be maximized through a private sale, lease termination, or rejection, of the relevant Lease.  Any such private sale or lease termination may be presented to the Court for approval at the Sale Hearing.

(ii)  Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction.  Only the authorized representatives of each of the Qualified Bidders, the Committee, and the Debtors shall be permitted to attend the Auction.  At the Auction, Qualified Bidders will be permitted to increase their bids.

(iii)  The bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid as disclosed to all Qualified Bidders prior to commencement of the Auction (the "Starting Qualified Bid"), and then continue in increments of at least $10,000.

(iv)  The Debtors, in their discretion, may adopt rules for the Auction at or prior to the Auction that, in their discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order.  All such rules will provide that all bids

shall be made and received in one room, on an open basis, and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction.

(f)     **Sale Hearing**:  The Debtors will present the results of the Auction, together with the highest or otherwise best Qualified Bid (the "<u>Successful Bid</u>," and the entity submitting the Successful Bid, the "<u>Successful Bidder</u>") and the next highest or otherwise best offer after the Successful Bid (the "<u>Next Highest Bid</u>," and the entity submitting the Next Highest Bid, the "<u>Next Highest Bidder</u>"), as well as any proposed private sale or termination of a lease, to the Bankruptcy Court at the Sale Hearing, at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (i) the Auction was conducted and the buyers were selected in accordance with these Bidding Procedures, (ii) the sale process was fair in substance and procedure, and (iii) consummation of the Sale Transactions will provide the highest or best value for the Lease(s) and are in the best interests of the Debtors and their estates.

In the event that, for any reason, any Successful Bidder fails to close the Sale Transaction contemplated by its Successful Bid, then, without notice to any other party or further court order, the Debtors shall be authorized to close with the Qualified Bidder that submitted the Next Highest Bid.

(g)     **Closing and Return of Good Faith Deposit**:  Except as otherwise provided in this Section with respect to any Successful Bidder and any Next Highest Bidder, the Good Faith Deposits of all Qualified Bidders shall be returned upon or within two (2) business days after Closing of the relevant Sale Transaction.  The Good Faith Deposit of each Successful Bidder shall be held until the closing of the relevant Sale Transaction and applied in accordance with the Successful Bid.  The Good Faith Deposit of the Next Highest Bidder shall be returned upon or within one (1) business day after closing of the Sale Transaction with the Successful Bidder.  In the event the Debtors proceed to closing with a Next Highest Bidder, the Good Faith Deposit of such Next Highest Bidder shall be held until the closing of the Sale Transaction with the Next Highest Bidder and applied in accordance with the Next Highest Bid.  If a closing does not occur by March 15, 2009, the disposition of Good Faith Deposits shall be as provided in the relevant bids.

Except as otherwise agreed in writing by the Debtors, the closing of a Sale Transaction shall take place within two (2) business days following the entry of the Sale Order approving the assumption and assignment of the Lease(s) (the "**Closing**").  Upon failure to consummate a sale of some or

all of the Leases due to a breach by the Successful Bidder, the Debtors shall retain the Good Faith Deposit as liquidated damages, and the Next Highest Bid with respect to some or all of the Lease(s), shall be deemed the Successful Bid and shall consummate the sale of the Lease(s) without further order of the Court. The Next Highest Bidder shall keep its bid open for fourteen (14) days after entry of the order approving the Sale Transaction with the Successful Bidder and the Next Highest Bidder (in the event the Sale Transaction is unable to close).

13.     The Debtors will serve a copy of the notice of auction attached hereto as <u>Exhibit F</u> (the "<u>Auction Notice</u>") not later than two (2) business days after entry of the Bidding Procedures Order on: (i) the U.S. Trustee, (ii) counsel to the DIP Agent; (iii) counsel to the Committee, (iv) all known potential purchasers of the Leases, (v) all landlords under the Leases, and their counsel if known to the Debtors, and (vi) all parties entitled to receive notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>"). Such notice shall be deemed adequate and sufficient notice of the Bid Procedures, the Cure Procedures, the Auction, and the Sale Hearing.

**C.     <u>Stalking Horse Bid Protections</u>**

14.     The Debtors reserve the right at any time, in their sole discretion, prior to the Auction, to select and negotiate one or more "stalking horse" bids (each holder of such a bid, a "<u>Stalking Horse Bidder</u>") and enter into an agreement with the Stalking Horse Bidder for one or more of the Leases ( a "<u>Stalking Horse Agreement</u>"). As consideration for the value of such stalking horse bid(s), in the event that the Court should determine that another party's competitive bid is a higher or better offer and the Debtors thereafter close a Sale Transaction with such third party, then, subject to the Court's approval, the Debtors propose to pay the relevant Stalking Horse Bidder a break-up fee (the "<u>Break-Up Fee</u>") in an amount up to three percent (3%) of its aggregate bid ("aggregate" being defined as the total value of the consideration offered in its bid for all Leases), plus reimbursement of the Stalking Horse

Bidder's actual, necessary, reasonable and documented out-of-pocket expenses, up to a maximum cap to be established by the Debtors in consultation with the Committee (the "Expense Reimbursement," and together with the Break-Up Fee, the "Stalking Horse Bid Protections").]

**D.      Lease Termination Agreements**

15.      In the event that a landlord is the successful bidder for the Lease under which it is the landlord, the Debtors hereby request authorization to enter into a Lease Termination agreement (substantially in the form attached hereto as Exhibit E) with any such landlord and to seek approval from this Court for such Lease Termination Agreement at the Sale Hearing.

**E.      Terms of any Sale Transaction**

16.      Any sale, assignment or other disposition of a Lease shall be without representations or warranties of any kind, nature or description by the Debtors, their agents or representatives.  Each of the Leases shall be transferred "as is" and "where is."

17.      Unless otherwise indicated by the Debtors at the Auction, sales of the Leases shall not include personal property, inventory, fixtures, trade fixtures, or other furnishings or equipment located at the premises, whether or not owned by the Debtors.  The Debtors reserve the right either to sell such personal property to the Successful Bidder or Next Highest Bidder, as applicable, or to any other party, to abandon any or all of the personal property located at each of the leased premises, or to make such other arrangements as may be appropriate.

18.      All sales, transfer and recording taxes, stamp taxes or similar taxes, if any, relating to the assignment of the Leases or the sale of personal property of the Debtors in connection therewith shall be the sole responsibility of the Successful Bidder or Next Highest Bidder, as applicable, and shall be paid to the Debtors at the Closing for each Lease or group of Leases.

19.     In order to attract the highest and best offers, the Debtors respectfully request that the Leases be assigned and sold, pursuant to section 363(f) of the Bankruptcy Code, free and clear of all liens, claims, encumbrances, and security interests, which shall attach to the net proceeds received by the Debtors as a result of the sale with the same force and effect that they would now have, subject to further order of the Court.

20.     The Debtors also request that the Successful Bidder or Next Highest Bidder, as applicable, be afforded all the protections provided under section 363(m) of the Bankruptcy Code to good faith purchasers.

**F.      Cure Procedures & Sale Objections**

21.     To facilitate and effect each Sale Transaction, the Debtors will be required to determine and establish the cure amounts for each applicable Lease, which cure amounts would be paid out of the proceeds of any Sale Transaction.  Accordingly, the Debtors also request that the following Cure Procedures be followed in order to determine and establish the cure amounts through the closing date of the Sale Transactions (the "Cure Amounts").

22.     The Debtors will serve a copy of this Motion, and a copy of the schedule of Leases and respective Cure Amounts attached hereto as Exhibit C, upon the non-Debtor parties to the Leases.  To facilitate a prompt resolution of any cure disputes and objections relating to the sale of the Leases and related Cure Amounts, the Debtors seek approval of the  following deadlines and procedures:

     (a)     The non-Debtor parties to the Leases shall have until 4 p.m. (prevailing Eastern Time) on January 5, 2009 (the "Sale Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed sale of the non-Debtor party's Lease;

     (b)     Any objection to a Cure Amount, whether or not the objecting party previously has filed a proof of claim with respect to amounts due under the applicable agreement, or to the potential sale of a Lease (a "Sale

Objection"), shall (a) be in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the sale of the Lease, as applicable, and/or any and all objections to the potential sale of the Lease, together with all documentation supporting such cure claim or objection; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on or before 4:00 p.m. (prevailing Eastern Time) on the Sale Objection Deadline, or such later date and time as the Debtors may agree; and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: John C. Longmire, Esq.; (ii) Hilco, 5 Revere Drive, Suite 320, Northbrook, IL 60062, Attn: Ross Block; (iii) counsel to the Official Committee of Unsecured Creditors, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, NY 10169, Attn: Glenn B. Rice, Esq.; and (v) the Debtors, 23241 Westerville Road, Columbus, OH 43224, Attn: Stephen B. Darr, Chief Financial Officer, (v) the U.S. Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004, Attn: Gregory Zipes, Esq.  If a Sale Objection as to a Cure Amount is timely filed, the Debtors shall schedule a hearing to determine the amount of any disputed Cure Amount not settled by the parties. Notwithstanding anything herein to the contrary, an unresolved Sale Objection to a proposed Cure Amount shall not prohibit or otherwise affect the Debtors' ability to consummate a Sale Transaction, pursuant to the procedures set forth herein.

(c)     The Debtors may, in their sole discretion, extend a party's Sale Objection Deadline once or successively without further notice, but are not obligated to do so.

23.     In the event that no Sale Objection is timely filed, or if a Sale Objection is filed that does not contain an objection to a proposed Cure Amount, the Debtors request that the applicable party be deemed to have consented to the Cure Amount proposed by the Debtors and be forever enjoined and barred from seeking any additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtors, their estates, or any assignee on account of the sale of the Leases and be deemed to have consented to the proposed sale of such Lease.  In addition, if no timely Sale Objection is filed, upon approval by this Court of the sale of a Lease, the Debtors request that the assignee enjoy all of the rights

and benefits under each Lease, as applicable, without the necessity of obtaining any party's written consent to the Debtors' sale of the Lease, and each such party shall be deemed to have waived any right to object to, consent to, condition or otherwise restrict any such assumption and/or assignment.

## G.     Waiver of the 10-Day Stay Period

24.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for ten days after the entry of the order, unless the court orders otherwise.  The Debtors respectfully request that the Court waive such ten day stay with respect to the sales and assignment of the Leases.  Such a waiver is permitted by the express language of the rules and is appropriate under the circumstances. Moreover, requiring the Debtors to pay additional unnecessary administrative obligations under the sold Leases, during the stay period, would place a substantial burden on the estates.

## BASIS FOR RELIEF

## A.     Sound Business Reasons Support
##        the Sale of the Leases and the Bidding Procedures

25.     Section 363(b) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  See In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992).  To sell property under section 363(b) of the Bankruptcy Code, the Debtors must demonstrate to the Court a legitimate business justification for the proposed action.  See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  As this Court has stated, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Comm. of

<u>Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).

26.     Here, there are sound business justifications for the sale of the Leases and the procedures proposed herein. The Debtors are near completion of the GOB Sales. The Debtors' real estate advisors, Hilco, have been reviewing the Debtors' interests in the Leases in order to determine whether there is additional value that may be realized for these estates through the sale of the Debtors' Leases. Hilco recommended to the Debtors that the best way to maximize value from the Leases would be to conduct an immediate sale and auction process for the Leases. In order to maximize the value of the Leases, the Debtors must be able to sell their Leases promptly and in a streamlined process so as to avoid the costs associated with additional rent and other unnecessary administrative obligations that would accrue if this process were delayed. The Bidding Procedures will enable the Debtors to obtain the highest and best offers for the Leases through such a streamlined process. Approval of the Bidding Procedures, the Cure Procedures and the sale of the Leases are in the best interests of these estates and their creditors.

**B.      The Assumption and Assignment of the Leases Pursuant
         to Section 365 of the Bankruptcy Code Should be Approved**

27.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease . . . " 11

U.S.C. § 365(a). A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), the predecessor to section 365 of the Bankruptcy Code) (rejecting the test of whether the executory contract was burdensome in favor of whether rejection is within the debtor's business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

28.     Moreover, a debtor may assume and assign an unexpired lease notwithstanding requirements in such unexpired lease that otherwise would require the consent of the lessor to effect such assignment. Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1).

29.     Section 365(b) of the Bankruptcy Code also requires that a debtor in possession meet certain additional requirements to assume an executory contract or unexpired lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at

and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).  This section does not apply to a default that is a breach of a provision relating to:

(A)     the insolvency or financial condition of the debtor at any time before the closing of the case;

(B)     the commencement of a case under this title;

(C)     the appointment of or taking possession by a trustee in a case under [the Bankruptcy Code] or a custodian before such commencement; or

(D)     the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2).

30.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong

likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether the rent will be paid").

31.     The Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Leases will be satisfied at the Sale Hearing.  As noted above, the Debtors believe that the assumption and assignment of the Leases to the Successful Bidders or Next Highest Bidders, as applicable, is in the best interests of the estates and their creditors and that the Debtors have exercised sound business judgment in determining to sell the Leases. Moreover, the Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Leases. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Leases to the Successful Bidders (or the Next Highest Bidders) is in the best interests of their estates.  The Debtors will provide all parties to the Leases an opportunity to be heard.  Specifically, each non-Debtor party to a Lease shall receive notice of this Motion, as well as of the Auction.  Such notice will, among other things, identify the Debtors' proposed Cure Amounts.  Moreover, the Cure Procedures permit the Debtors to continue with a Sale Transaction, and resolve objections to Cure Amounts outside of the sale process.  If no Sale Objection is timely received, the assignment of the applicable Lease, and the Debtors' proposed Cure Amount, would be approved.

32.     Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment of the Leases should be approved.

**C.      The Bid Protections Sought Herein Should Be Approved**

33.     Approval of a break-up fee and expense reimbursement as a form of protection to a stalking horse bidder in connection with a sale of the debtor's assets has become a recognized practice in chapter 11 cases in this and other bankruptcy courts.  See In re 310 Assocs., Inc., 346

4629511_1.DOC

F.3d 31 (2d Cir. 2003); <u>Integrated Res., Inc.,</u> 147 B.R. 650; <u>In re Crowthers McCall Pattern, Inc.,</u>

114 B.R. 877 (Bankr. S.D.N.Y. 1990); <u>In re 995 Fifth Ave. Assocs., L.P.,</u> 96 B.R. 24 (Bankr.

S.D.N.Y. 1989). Specifically, break-up fees can (a) attract or retain a potentially successful bid,

(b) establish a bid standard or minimum for other bidders to follow, and (c) attract additional

bidders. <u>Integrated Res., Inc.,</u> 147 B.R. at 661-62. "It has become increasingly common in

section 363 sales of significant portions of an estate's assets for the prospective buyer to demand

a breakup fee or other protection in the event that the sale is not consummated." 3 COLLIER ON

BANKRUPTCY ¶ 363.03[7] (15th rev. ed. 2002).

34. Courts in the Second Circuit generally have deferred to a debtor's business

judgment in evaluating whether a proposed Break-Up Fee is appropriate. <u>Integrated Res., Inc..</u>

147 B.R. at 657. Courts will approve break-up fees and other bidding protections so long as (a)

the relationship between the debtor and the bidder receiving the break-up fee is not tainted by

self-dealing, (b) the fee does not hamper bidding, and (c) the amount of the fee is reasonable in

relation to the size of the transaction. <u>Id</u>.

35. Here, the Debtors are merely seeking the authority to provide, in their discretion,

a Stalking Horse Bidder, to the extent that one is actually selected, with a break-up fee of up to

three percent (3%) of its aggregate bid and the reimbursement of actual, documented, and

reasonable expenses, subject to a cap, incurred in connection with making its offer. Such

provisions are within the range of amounts approved in other retail bankruptcy cases of similar

size and complexity. <u>See</u>, <u>e.g.</u>, <u>In re Mervyn's Holdings, LLC</u>, Case No. 08-11586 (KG) (Bankr.

D. Del. Oct. 27, 2008) (approving $2.5 million break-up fee to stalking horse bidder, assuming

stalking horse bidder is not successful bidder); <u>In re Linens Holding Co.</u>, Case No. 08-10832

(CSS) (Bankr. D. Del. May 30, 2008) (approving break-up fee of $1,500,000 to stalking horse

agent relating to debtors' store closing sales), In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (authorizing break up fee of 2% of purchase price and expense reimbursement capped at $500,000 in connection with auction of debtor's assets in 363 sale). The Debtors believe that the Break-Up Fee and the Expense Reimbursement are necessary in order to obtain the highest and best offers for the Leases and should be approved.

**D.      Sale of the Leases Should be Free and Clear of Liens, Claims and Encumbrances**

36.    The Debtors submit that it is appropriate that the Sale Transactions be approved free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, or interests to attach to the net sale proceeds of the Sale Transactions, subject to any applicable rights and defenses of the Debtors. See Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC), 423 F.3d 166, 169, n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers . . . to acquire assets without any accompanying liabilities."). See also Faulkner v. Bethlehem Steel/Int'l Steel Group, 2005 U.S. Dist. LEXIS 7501, at *4 (N.D. Ind. 2005) (enforcing order approving sale of assets under section 363 "free and clear of any other interests, claims or liens -- including any claims arising under successor liability"); Carcasole-Lacal v. Am. Airlines, Inc., 2003 U.S. Dist. LEXIS 11507 (E.D.N.Y. 2003), aff'd 2005 U.S. App. LEXIS 13619 (2d Cir. 2005) (dismissing suit of former employee of the debtor brought against purchaser of debtor's assets; sale order pursuant to section 363 blocked such successor liability); Circus Time, Inc. v. Oxford Bank and Trust (In re Circus Time, Inc.), 5 B.R. 1, 3 (Bankr. D. Me. 1979) (finding the Court's power to sell property free and clear of liens has long been recognized). Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.     To facilitate the Sale Transactions, the Debtors require authorization to sell the Leases free and clear of any and all liens, claims, encumbrances, or interests, with any such liens, claims, encumbrances, or interests to attach to the net proceeds of the Sale Transactions with the same rights and priorities therein as they had in the Leases, and subject to any applicable rights and defenses of the Debtors.  See In re Riverside Investment P'ship, 674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale and discharged at the time of sale . . . .").  Because section 363(f) is stated in the disjunctive, when selling property of the estate it is only necessary to meet one of the five conditions of that section.  In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992).

38.     Each lien, claim, encumbrance, or interest satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and the Debtors submit that any such lien, claim, encumbrance, or interest will be adequately protected by attachment to the net proceeds of the applicable Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  See Circus Time, Inc., 5 B.R. at 3.  The Debtors believe that each of the parties holding liens on any of the Debtors' Leases could be compelled to accept a monetary

satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code. In addition, any holders of liens who fail to object to this Motion may be deemed to have consented to the Sale Transactions, satisfying section 363(f)(2) of the Bankruptcy Code. Thus, the Debtors submit that approving the Sale Transactions free and clear of liens, claims, encumbrances, and interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code. Additionally, the Debtors' prepetition and postpetition secured lenders, the only parties which may have a security interest in the Leases (or their proceeds), have consented to the sale thereof. Thus, a sale of the Leases free and clear of liens, claims, and encumbrances is appropriate in these circumstances. Accordingly, the Debtors request that the Sale Transactions be approved free and clear of all liens, claims, encumbrances, and interests, with such liens, claims, encumbrances, and interests to attach to the net proceeds of the Sale, subject to all applicable rights and defenses of the Debtors.

**E.      The Successful Bidders and Next Highest Bidders are
         Good Faith Purchasers Under Section 363(m) of the Bankruptcy Code**

39.      Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser's interest in property purchased from the debtor is protected regardless of where approval of the sale is subsequently modified or reversed on appeal. Specifically, section 363(m) of the Bankruptcy Code provides, in part:

> The reversal or modification on appeal of an authorization under
> [section 363(b) of the Bankruptcy Code] of a sale . . . of property
> does not affect the validity of a sale . . . under such authorization to
> an entity that purchased or leased such property in good faith . . . .

40.      The purpose of section 363(m) of the Bankruptcy Code is to foster the policy of finality to judgments of the bankruptcy court, particularly those upon which third parties rely. See Pitt. Food & Beverage, Inc. v. Ranallo, 112 F.3d 645, 647-648 (3d Cir. 1997) (quoting In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986)). See also Allstate Ins. Co. v.

Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) (noting that good faith transfers of property should not be affected by the reversal or modification on appeal of an unstayed order). Additionally, section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code. See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998). In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the Leases may be assumed and assigned pursuant to section 365 of the Bankruptcy Code and the protections of section 363(m) of the Bankruptcy Code should be afforded to the assignees. In light of Krebs, the Debtors respectfully submit that section 363(m) of the Bankruptcy Code applies to protect each assignee with respect to the Leases.

41.    The Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchasers to act in good faith in negotiating the sale of the Leases. Although the Bankruptcy Code does not define "good faith purchaser," courts construing section 363(m) of the Bankruptcy Code have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).  Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings."  In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Mach. Corp., 572 F.2d at 1998).

42.     Here, the sale of the Leases is in good faith.  There is no evidence of fraud or collusion.  To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any Sale Transactions will be the culmination of a solicitation and negotiation process.  No known potential bidder is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations will be conducted on an arms length, good faith basis.  With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  Under the circumstances, the Successful Bidders (or the Next Highest Bidders) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.  Furthermore, the Bidding Procedures are designed to prevent the Debtors or the Successful Bidders (or Next Highest Bidders) from engaging in any conduct that would cause or permit an Assignment and Assumption Agreement, or the sale of a Lease to a Successful Bidder (or Next Highest Bidder) pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

43.     As the Debtors will establish at the Sale Hearing, the selection of the Successful Bidders or the Next Highest Bidders, as applicable, will be the product of arms' length, good faith negotiations in a fair and open auction process.  The Debtors request that this Court find at

the Sale Hearing that each of the assignees for each of the Leases is a good-faith purchaser entitled to the protections afforded under section 363(m) of the Bankruptcy Code.

**F.      Relief from the Ten Day Waiting Periods**
**        Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

44.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

45.      Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) counsel to the DIP Agent; (iii) counsel to the Committee; (iv) all known parties having an interest in the Leases; (v) counsel to all landlords under the Leases; and (vi) all parties who have filed requests for service of all pleadings pursuant to Bankruptcy Rule 2002 as of the day prior to the service hereof.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary or required.

46.      No previous motion for the relief sought herein has been made to this or any other court.

47.      Because this Motion raises no novel issues of law, and the authorities relied upon herein are set forth above, the Debtors respectfully submit that the Motion itself satisfies the requirements of Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York regarding the submission of a memorandum of law.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, the Debtors respectfully requests the Court enter orders granting the relief requested herein and such other relief as the Court deems just and proper.

Dated: New York, New York
       December 17, 2008

                                  WILLKIE FARR & GALLAGHER LLP
                                  Attorneys for Debtors and Debtors in Possession

                                  By: /s/ John C. Longmire
                                      John C. Longmire
                                      (A Member of the Firm)
                                      Lauren C. Cohen

                                  787 Seventh Avenue
                                  New York, New York  10019
                                  (212) 728-8000