IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 Cases |
| Value City Holdings, Inc., et al., | Case No. 08-14197 (JMP) |
| Debtors. | Jointly Administered |

**AFFIDAVIT OF W. EDWARD CLINGMAN, JR.
IN SUPPORT OF CONFIRMATION OF THE DEBTORS'
MODIFIED FIRST AMENDED JOINT PLAN OF LIQUIDATION FOR
VALUE CITY HOLDINGS, INC. AND ITS AFFILIATED DEBTORS**

COMMONWEALTH OF VIRGINIA )
): ss.
COUNTY OF HANOVER )

W. EDWARD CLINGMAN, JR. being duly sworn, deposes and says:

1. I am the Chief Wind-down Officer of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I make this affidavit (the "Affidavit") in support of confirmation of the Debtors' Modified First Amended Joint Plan of Liquidation for Value City Holdings, Inc. and Its Affiliated Debtors (as may be amended, modified, and/or supplemented from time to time, the "Plan").[1] Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial position. If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2. Section I of this Affidavit briefly describes my professional background and experience. Section II sets forth the relevant facts supporting confirmation of the Plan. Section III sets forth my conclusions regarding the "best interests" test. Section IV of this Affidavit sets forth the basis for the substantive consolidation of the Debtors envisioned by the Plan and Section V sets forth the reasons why I believe the releases granted pursuant to the Plan are appropriate. Lastly, Section VI sets forth my conclusions regarding the Plan.

### I. PROFESSIONAL BACKGROUND

3. I have served as CWO of the Debtors since January 2009, when my appointment was approved *nunc pro tunc* by the Court. I have extensive experience providing bankruptcy administration services, including leading the wind-downs of bankruptcy estates in a number of chapter 11 cases. I am a licensed attorney and certified public accountant. I am also the co-founder and principal of Clingman & Hanger Management Associates, LLC ("C&H"), a firm specializing in the administration of business wind-downs inside and outside of chapter 11 of the Bankruptcy Code. I have served as the chief executive officer of Best Products Company, Inc. during its liquidation and related wind-down and on the board of directors and audit committee of another chapter 11 debtor, Bradlees, Inc. I have also led a number of successful wind-downs inside and outside of chapter 11, including Venture Stores, Inc., Fruit of the Loom, and House2Home, Inc.

### II. REQUIREMENTS FOR PLAN CONFIRMATION

A. The Plan

4. The Plan was recently filed with the Court and is supported by the Creditors' Committee and the majority of the creditors who voted on the Plan. The Plan is a liquidating plan that contemplates the wind-down of these cases, the administration of the Estates, and the distribution of the Debtors' remaining assets, after payment of Allowed secured and

priority claims, on a *pro rata* basis to general unsecured creditors.  The Plan is the culmination of over 18 months of tireless effort by the Debtors to recover every asset available for distribution, in an effort to be able to meet the confirmation standards of section 1129 of the Bankruptcy Code, including satisfying administrative and priority claims in full.

B.  The Plan Complies, and the Debtors have Complied, With the Applicable Provisions of the Bankruptcy Code

5. Articles IV and V of the Plan set forth the classification of Claims and Interests and provide for treatment of all Classes and other categories of Claims and Interests.  The Plan specifies which Classes are unimpaired or impaired under the Plan.  The Plan places similarly situated Claims and Interests in the same Class and treats identically each Claim or Interest within a particular Class.  The Plan is dated and identified with the names of the Debtors.

6. Article VII, among other provisions of the Plan, provides for adequate means of the Plan's implementation including, without limitation: (a) the continued existence of the Debtors as the Liquidating Companies post-emergence; (b) the designation, powers and succession of the Plan Administrator; (c) formation of the Post-Confirmation Committee; (d) the establishment of the Wind-down Reserve to fund the activities and operations of the Liquidating Companies and the Plan Administrator in accordance with the terms of the Wind-down Budget; (e) the inclusion in the certificates of incorporation and the by-laws of the Liquidating Companies of provisions prohibiting the issuance of nonvoting equity securities; (f) specified distribution mechanisms and procedures; (g) the assumption or rejection of executory contracts and unexpired leases; and (h) the post-confirmation retention of jurisdiction by this Court as necessary in connection with the implementation and consummation of the Plan.

7. Further, the Disclosure Statement Order has been entered, and the Wind-down Budget has been completed. Accordingly, the conditions precedent to confirmation of the Plan have been satisfied.

8. The Plan provides a manner of selection of the Plan Administrator consistent with the interests of creditors and equity security holders and with public policy. I believe that the means of implementation set forth in the Plan are reasonable, and will enable the Debtors to implement and satisfy their obligations under the Plan.

9. The Debtors, in consultation with the Creditors' Committee, have selected C&H to serve as the Plan Administrator. I believe C&H has acquired a thorough understanding of the Debtors' pre- and post-petition operations and is well qualified to serve as Plan Administrator. The personnel employed by the Plan Administrator shall be compensated pursuant to the terms of the Plan Administrator Agreement which will be submitted to the Court in connection with the Confirmation Hearing.

C.   Good Faith

10. The Chapter 11 Cases were commenced in an extremely difficult environment–a complete chain-wide liquidation during one of the worst retail markets in history, which left trade creditors, landlords and employees alike in disappointing circumstances. As a result, the Debtors and their management had to work with extraordinary diligence to recover and monetize assets of the Estates sufficient to permit confirmation of the Plan.

11. Since I became CWO of the Debtors, we have reached some significant resolutions and milestones in recovering assets for distribution. After the completion of the court approved liquidation of the Debtors' inventory and the disposition of the majority of the Debtors' real estate interests, the Debtors were able to satisfy the outstanding obligations under their postpetition financing arrangements, and were able to cash collateralize their outstanding letters of

credit. In an effort further to reduce costs, and in response to notification that the Debtors' postpetition lenders would not renew the Debtors' letters of credit, the Debtors successfully replaced their letters of credit with a new lender at substantially lower costs. Shortly thereafter, the Debtors reached a settlement with their workers' compensation claim provider, which resulted in the release of over $5 million in cash for distribution to their creditors.

12. Also during this time, the Debtors successfully obtained access to certain settlement proceeds from the 1996 class action lawsuits by certain retailers and retail trade associations against Visa U.SA. Inc. and Mastercard International Incorporated, bringing in an additional approximately $1.5 million for distribution.

13. The Debtors have also successfully settled various real estate matters, resulting in over $1.5 million in recoveries for the Debtors estates, and settled various administrative and priority expense claims. The Debtors, through various objections to claims, have also reduced the overall amount of priority claims in these cases by approximately $45 million. The Debtors also engaged Storch, Amini, & Munves, P.C., as Special Counsel to analyze and litigate preference claims. As a result of the time and effort that the Debtors have expended to analyze and pursue preference claims, the Debtors have to date recovered close to $900,000 on account of such claims, and have pending settlement agreements that are anticipated to yield an additional $560,000 in the immediate future, with additional future recoveries anticipated. Without the achievement of these significant milestones, the Debtors would not be in a position today to confirm the Plan.

14. The Plan itself is also the product of months of negotiations between the Debtors and the Creditors' Committee, and reflects input from various other constituencies. In the Debtors' view, the Plan maximizes the value of the Debtors' estates for the benefit of their

creditors and stakeholders. Further, it is my understanding that the Plan has been proposed in compliance with all applicable laws, rules and regulations. I therefore believe that the Plan complies with the good faith requirement of the Bankruptcy Code.

D.     Any Payments to be Made by the Debtors for Services or for Costs and Expenses Have Been Approved By or Are Subject to Approval of the Court

15.     Any agreement by which the Debtors retained a professional person to provide services to the Debtors in, or in connection with, the Reorganization Cases has been disclosed to the Court in applications to employ such professionals. All fees and expenses of the professionals in these cases are subject to final approval of the Court under section 330 of the Bankruptcy Code.

16.     Section 3.2 of the Plan contains procedures for filing applications for final allowance of Fee Claims and procedures for the payment of Professional Fees, subject to the procedures established by the Bankruptcy Code and prior orders of this Court, including this Court's Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated November 19, 2008. The proposed Confirmation Order contains additional provisions regarding applications of professionals for final approval of fees and expenses in these cases. In addition, Section 13.1(h) of the Plan provides for the Court's retention of jurisdiction to hear and determine Fee Claims. Thus, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

E.     Disclosure Regarding Directors, Officers and Insiders

17.     As discussed above, it has been proposed that C&H will serve as Plan Administrator. I believe that such appointment is consistent with the best interest of the Debtors, their creditors and equity security holders, and public policy. The Plan Administrator Agreement,

which sets forth the terms of the proposed retention, is attached as an exhibit to the proposed Confirmation Order. Section 7.2 of the Plan provides that I shall be appointed the sole director (or, if applicable, manager) and officer of each of the Liquidating Companies and that I will not receive any compensation for my services as a director or officer of the Liquidating Companies. I believe that the provisions of the Plan related to the Plan Administrator and my appointment as the sole director (or, if applicable, manager) of the Liquidating Companies, which selections have been independently reviewed and commented on by the Creditors' Committee, are consistent with the interests of the Debtors, their creditors and equity security holders and with public policy.

F.  No Governmental Regulatory Commission
    has Jurisdiction Over the Rates of the Debtors

18. No governmental regulatory commission has or will have jurisdiction over the rates of the Debtors after the Confirmation Date, nor does the Plan propose any rate changes.

G.  The "Best Interest of the Creditors" Test

19. As described more fully in Section V below, in my capacity as CWO of the Debtors, I am necessarily familiar with, and have had the opportunity to evaluate, the financial condition of the Debtors. In connection with the Plan, the Debtors attempted to determine the likely value of their assets in the event of a liquidation under chapter 7 of the Bankruptcy Code, and the likely distributions to holders of Claims and Interests under such liquidation. The Debtors' liquidation analysis prepared as of March 11, 2010 (the "Liquidation Analysis") is annexed as Exhibit B to the Disclosure Statement, and was prepared with my assistance and under my supervision.

20. Based on the assumptions set forth in the Liquidation Analysis, Distributions to creditors under the Plan will not be less than those achievable under a chapter 7

liquidation of the Debtors. I therefore believe that the Plan satisfies the "best interest of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

H.   At Least One Class of Impaired Claims Has Accepted the Plan

21.   As set forth in the declaration of Stephanie Kjontvedt, of Epiq Bankruptcy Solutions, LLC, the Debtors' claims, noticing, and balloting agent, filed contemporaneously herewith in support of the Plan (the "Voting Declaration"), Class 4 has voted to accept the Plan as determined without any acceptance of the Plan by any insider. Thus, I have been informed that the requirement that at least one Class of impaired Claims accept the Plan, as determined without any acceptance of the Plan by any insider, has been met.

I.   Feasibility of Plan

22.   The Plan expressly provides for the liquidation of the Debtors. Thus, the requirement that the Plan is not likely to be followed by the need for further financial reorganization of the Debtors has been satisfied. I have been advised and believe that the Plan's treatment of Allowed Administrative Expense Claims (including Fee Claims), Priority Tax Claims, and Priority Non-Tax Claims satisfies section 1129(a)(9) of the Bankruptcy Code. I believe the Debtors will have the financial ability to make the payments to the holders of these claims as they come due in accordance with the terms of the Plan.

J.   All Statutory Fees Have Been or Will be Paid in Full

23.   Section 5.3 of the Plan provides that all unpaid fees of the type specified in 28 U.S.C. § 1930(a)(6) will be paid in accordance with the applicable schedule for payment of such fees. Further, the Plan provides that notwithstanding any provision of the Plan that provides for substantive consolidation of the Debtors, each Debtor shall pay all applicable United States Trustee quarterly fees under 28 U.S.C. §1930(a)(6) on all such Debtor's disbursements, including Plan payments and disbursements in and outside of the ordinary course of the Debtors' business,

plus interest due and payable under 31 U.S.C. §3717, until the entry of an order closing such Debtor's case, the entry of a Final Decree in such Debtor's case, dismissal of such Debtor's case, or conversion of such Debtor's case to chapter 7. Assuming the Plan is confirmed, the Debtors will have sufficient funds to pay any and all such fees in full.

K.  Retiree Benefits

24. The Plan does not discharge, release or relieve the Debtors, the Liquidating Companies or any other party, in any capacity, from any liability with respect to retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code.

L.  The Plan is Fair and Equitable, and Does Not Discriminate Unfairly

25. I am advised that, in order to be confirmed over the dissent of an impaired class of claims or interests, a chapter 11 plan must be "fair and equitable," and must not "discriminate unfairly," with respect to such dissenting impaired class. With respect to a dissenting class of impaired claims or interests, I am advised that "fair and equitable" means that, under the applicable plan, if each holder of applicable claims or interests does not receive property equal in value to the allowed amount of such claims or (in the case of interests) to the greater of (a) any applicable fixed liquidation preference, (b) any applicable fixed redemption price or (c) the value of such interest, then the holder of any claim or interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior claim or interest any property (often referred to as the "absolute priority rule"). Similarly, I understand that with respect to the classes of impaired Interests deemed to have rejected the Plan (Classes 5 and 6), the Plan must not discriminate unfairly or violate the absolute priority rule.

26. Given this legal backdrop, I am confident that the Plan neither discriminates unfairly nor violates the absolute priority rule with respect to Class 5 or Class 6, which under

section 1126(g) of the Bankruptcy Code are deemed to have rejected the Plan by virtue of the fact that they will receive no Distributions thereunder.

27. First, it is beyond dispute that the Plan does not discriminate unfairly, given that there exists only a single Class of Equity Interests (Class 5) and a single Class of Other Interests (Class 6), and each interest holder within those Classes, as the case may be, is to receive proportionately identical treatment under the Plan (i.e., no Distributions).

28. Second, the Plan is fair and equitable (i.e., does not violate the absolute priority rule) because with respect to both Class 5 and Class 6, no distribution of any kind will be made to holders of Interests junior in priority to either of such Classes.

29. In addition, no creditors in Classes senior to Class 5 and/or Class 6 will receive more than 100% of the allowed amounts of their Claims.

M. Competing Plan of Reorganization

30. I have been advised that the Plan (including previous versions thereof) is the only plan that has been filed in these cases.

N. Objection of Governmental Unit

31. No party in interest has requested that the Court not confirm the Plan on grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, and the principal purpose of the Plan is not such avoidance.

O. Conditions to Confirmation

32. Subject to the Court's approval of the substantive consolidation of the Debtors as proposed in the Plan, the conditions to confirmation contained in Section 11.1 of the Plan (that the Disclosure Statement Order, in form and substance reasonably satisfactory to the

Debtors, shall have been entered and that the Wind-down Budget shall have been completed) have been satisfied.

P.  Compromise and Settlement

33. Pursuant to Bankruptcy Rule 9019, and in consideration of the classification, distribution and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all the Claims and controversies resolved pursuant to the Plan.

### III.  LIQUIDATION ANALYSIS

A.  The Plan is in the Best Interests
of Holders of Impaired Claims or Interests

34. The Debtors prepared the Liquidation Analysis, which provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee would liquidate the assets of the Debtors' estates, as compared to the expected recoveries of the Debtors' creditors and interest holders under the Plan. The Liquidation Analysis is subject to the assumptions, qualifications, limitations set forth herein and in the Disclosure Statement.

35. The Liquidation Analysis examines the effects that a conversion of the Debtors' chapter 11 cases to cases under chapter 7 could have on the proceeds that could otherwise be available for distribution to holders of Claims against and Interests in the Debtors. Based upon the methodologies employed in the Liquidation Analysis, the net proceeds available as of March 11, 2010, for distribution to creditors under a chapter 7 liquidation would be approximately $12.9 million, before the deduction of liquidation costs that are estimated to be $3.7 million.

36. It is my belief that the foregoing reasonably estimates as of March 11, 2010, the potential proceeds that would be available in a chapter 7 liquidation of the Debtors to satisfy

Claims, under the assumptions set forth in the Liquidation Analysis. These assumptions include, among others, unique costs associated with a chapter 7 trustee and related professionals.

37. Accordingly, based on the assumptions described in the Liquidation Analysis, the holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims would receive an estimated 100% recovery on their Claims in a chapter 7 scenario. The holders of Allowed General Unsecured Claims, which are estimated to total $133 million, would receive their *pro rata* share of approximately $159,000, which equates to approximately .1% recovery on account of such claims in a chapter 7 scenario. As reflected in the Liquidation Analysis, Classes 5 and 6 are estimated to receive a 0% recovery both under the Plan and in a chapter 7 liquidation.

38. Under the Plan, the holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims will receive an estimated 100% recovery on their Claims. The holders of Allowed General Unsecured Claims, which would be otherwise entitled to a .1% recovery in a chapter 7 liquidation, are estimated to receive a recovery of .6% on account of their respective Allowed General Unsecured Claims under the Plan.

39. Accordingly, I believe that the Plan clearly meets the "best interests test" under section 1129(a)(7) of the Bankruptcy Code and maximizes recoveries to the holders of Impaired Classes of Claims and Interests under the Plan. As described above, the recoveries realized by each Impaired Class of Claims receiving distributions under the Plan are estimated to be greater than the distributions they would receive in a hypothetical chapter 7 case.

### IV. SUBSTANTIVE CONSOLIDATION

40. The Plan provides for the substantive consolidation of the Debtors into a single entity for claims allowance and distribution (but not corporate or partnership entity)

purposes. Accordingly, among other things, all Intercompany Claims among the Debtors are to be eliminated, claims against any Debtor will be treated as claims against a single consolidated estate, and assets of any Debtor will be treated for the purposes of Distribution as belonging to a single, consolidated estate.

41. The facts here lead me to conclude that substantive consolidation is appropriate for the Debtors. Among other things: (a) there is a significant amount of intercompany indebtedness among the Debtors; (b) the Debtors file consolidated tax returns and financial statements; (c) information furnished to creditors to facilitate their credit decisions generally was provided on a consolidated basis; (d) the Debtors share the same management and were in many ways operated as a single, consolidated enterprise; and (e) funds of the respective Debtors were often commingled in single accounts. In fact, any attempt to untangle the operations, finances and claims by and between the Debtors would be impractical if not impossible. Most significantly, RVI, the Debtors' former parent, primarily assumed responsibility for maintaining the Debtors' financial information, including with respect to accounting, employee benefits, insurance coverage, and store lease information. Even postpetition RVI continued to provide these services to the Debtors. However, once the Debtors liquidated their stores, in an effort to reduce costs, the Debtors were forced to minimize their staff to the bare minimum necessary, and efforts to obtain information from RVI became more and more difficult. Accordingly, much of the institutional knowledge that would be necessary to begin to untangle the Debtors' prepetition and postpetition transactions is no longer accessible to the Debtors and their Estates. Further, prior to January 2008, the Debtors operated as just a small piece of a much larger web of intercompany transactions with RVI and its then other subsidiaries and affiliates. The costs of trying to recover the necessary information, let alone figuring out how to untangle the

information, would certainly outweigh any benefit that could be achieved by not substantively consolidating the Estates. Additionally, postpetition, the Debtors only maintained a single checking account in the name of one of the Debtors. Accordingly, as was done prepetition, the general expenses of the Debtors postpetition were paid by one Debtor on account of another Debtor. Accordingly, without substantive consolidation of the Estates, the Debtors would have large intercompany claims that would be entitled to administrative expense priority, further depleting the benefit that any one claimant could achieve by having its claim against a particular Debtor. As a consequence of these facts, as well as additional facts set forth in Section V.B of the Disclosure Statement, the cost of untangling the Debtors' affairs and proposing separate chapter 11 plans for each would likely be substantial and far outweighing any potential benefits, which I do not believe exist in any case, and would so deplete the amount of distributable cash available for the holders of General Unsecured Claims, that it could render the Plan, or any plan, unconfirmable. Moreover, as explained in detail in Section V.B of the Disclosure Statement, the substantive consolidation of the Debtors will not result in prejudice to any party. Hence, I believe that substantive consolidation is not only justified here, but is also in the best interest of the Debtors' creditors.

## V. RELEASES

42. Notably, the Plan does not provide for any releases of claims by the Debtors or any third parties against non-Debtors that arose prior to the Petition Date. The Plan only provides for releases by the Debtors (the "<u>Debtors' Releases</u>") and entities that have held, hold, or may hold a Claim or Interest against one or more of the Debtors (the "<u>Third Party Releases</u>" and, together with the Debtors' Releases, the "<u>Releases</u>"), of certain <u>postpetition</u> claims against, among

others, the Debtors and the Released Parties[2] (the "Releasees"). Further Section 12.8 of the Plan provides for the exculpation of certain parties for any liability incurred in connection with any acts or omissions in connection with or arising out of the Debtors' restructuring (the "Exculpation").

43. The Plan reflects numerous settlements and compromises reached by the Debtors, the Creditors' Committee, and other constituencies, over the course of months of negotiation. Throughout that process, the Creditors' Committee objected to the breadth of the Releases initially provided under the Plan, among other objections. In an effort to accommodate the Creditors' Committee's concerns, the Debtors agreed, after the filing of the initial draft of their chapter 11 plan on February 4, 2010, to revise the Releases such that they would apply to postpetition conduct only. Indeed, the scope of the Releases was among the final issues resolved by the Debtors and the Creditors' Committee, and the Debtors' agreement to revise the Releases was necessary to fully and finally resolve the Committee's informal objections to the Plan. In sum, the Releases are the product of spirited negotiations between the Debtors and the Creditors' Committee, which has indicated its approval for the Releases in their current form.

44. During these cases, the Creditors' Committee undertook an investigation of possible claims against various parties with contractual and other relationships to the Debtors. Based on that investigation, the Creditors' Committee concluded that the Estates may have viable claims against various parties. The Releases do not release Claims based on the prepetition acts or omissions of non-Debtors. As a result, the claims identified and investigated by the Creditors'

---

[2] Pursuant to Section 1.75 of the Plan, "Released Party" means each of the Debtors' respective parents (other than RVI or any parent or non-Debtor subsidiary of RVI), subsidiaries and affiliates (not including the Debtors, RVI or any parent or non-Debtor subsidiary of RVI) and each of the foregoing's and the Debtors' current and former shareholders (other than the Debtors, RVI or any parent or non-Debtor subsidiary of RVI), directors, officers, agents, employees, attorneys, consultants, professional advisors, and the Creditors' Committee and its members, attorneys, consultants and professional advisors, in each case, serving in such capacity on or after January 23, 2008.

-15-

Committee are unaffected by the Releases, and the Liquidating Companies will be able to pursue such Claims following consummation of the Plan.

45. Moreover, the threat of litigation has been ubiquitous in these cases, and without even postpetition protection for the Released Parties, it is unlikely that a consensual plan having the broad-based support of the Plan could have been achieved. Many of the Released Parties were important participants in the Plan formulation process, and would have been unlikely to make the concessions necessary to finalize the Plan without protection from liability in connection with their postpetition efforts.

46. In addition, because the Released Parties are effectively releasing all claims against and interests in the Debtors pursuant to section 12.3 of the Plan, the Debtor Releases are mutual.

47. It is my understanding that the Releases satisfy the applicable standard and therefore should be approved. Specifically: (a) the Releases are an integral part of the settlement of contested issues between the Debtors' and the Creditors' Committee, and the other compromises and resolutions embodied in the Plan; (b) claims investigated by the Creditors' Committee are unaffected by the Releases; (c) numerous Released Parties share an identity of interest with the Debtors by virtue of their indemnification rights (and, because only postpetition activity is implicated by the Releases, the indemnification rights at issue may give rise to administrative expense claims); and (d) the Releases are consensual.

B. <u>The Releases are an Integral Part of the Plan.</u>

48. As noted above, the Releases are part of a compromise with the Creditors' Committee and are integral to confirmation of the Plan.

C. <u>The Released Parties Share an Identity of Interest with the Debtors.</u>

49. The propriety of the Releases for the benefit of the Debtors' employees, directors and officers is supported by the "identity of interest" between such Releasees and the Debtors arising out of certain indemnity relationships. The Debtors' directors and officers are beneficiaries of certain indemnification provisions contained in their organizational documents, which require the Debtors to indemnify them. Under these provisions, any claim asserted against a Released Party that the Debtors are obligated to indemnify would essentially be a claim against the Debtors, which obligations are expressly being assumed by the Liquidating Companies. Furthermore, because the Releases, by their terms, apply only to claims based on acts or omissions arising on or after the Petition Date, indemnity claims relating to such postpetition acts or omissions may be entitled to administrative expense status. Any such claim, even if ultimately unsuccessful, would further deplete the finite resources of the Estates.

D. <u>The Releases are Consensual.</u>

50. Consent is present for those who voted in favor of a Plan. In this case, holders of over 90% in amount of Class 4 Claims voted in favor of the Plan. Importantly, those who did not cast votes in favor of the Plan are deemed to release the Released Parties only to the extent permissible under applicable law. Furthermore, no party in interest in these cases has objected to the Release provisions of the Plan.

E. <u>The Releases are Narrowly Tailored.</u>

51. Lastly and most significantly, the Releases and the Exculpation are narrowly tailored. By their terms, the Debtor Releases and Third Party Releases only apply to claims, demands, debts, rights, causes of action or liabilities based in whole or in part on any act or omission, transaction, event or other occurrence <u>from the Petition Date through and including the Effective Date</u>. In addition, the Plan provides that Releases and the Exculpation shall not be

construed as a release of any person's fraud or willful misconduct for matters with respect to the Debtors and/or their Affiliates. The Plan further limits the Releases by expressly providing that the Third Party Releases do not release any non-Debtor Released Party from any claim by the United States Government, or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under: (a) the Internal Revenue Code or any state, city or municipal tax code, (b) the Employee Retirement Income Security Act of 1974, as amended, (c) any criminal laws of the United States or any state, city or municipality, (d) environmental laws, or (e) federal securities laws. Furthermore, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of set off, or other legal or equitable defenses that the Debtors had immediately prior to the Petition Date. As the Releases and the Exculpation Provision serve an important purpose, are narrowly tailored, and are based on the unique circumstances of these cases, in my view such provisions are necessary and appropriate. I believe that the Releases are in the best interests of the Debtors and their estates. Finally, I believe that the scope of the Releases and Exculpation are fair, equitable and reasonable.

## VI. CONCLUSION

52. Based upon the facts set forth herein, I believe that the Plan satisfies all of the applicable confirmation requirements contained in the Bankruptcy Code.

                                                          */s/ W. Edward Clingman*
                                                            W. Edward Clingman, Jr.

Sworn to before me this
10th day of May __, 2010.

*/s/ Diana L. Gill*
Notary Public

[Notary Seal: DIANA L. GILL, NOTARY PUBLIC, REG #145098, MY COMMISSION EXPIRES 03/31/13, COMMONWEALTH OF VIRGINIA]