UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re                                           :
                                                :     Chapter 11
Value City Holdings, Inc.,                      :
                                                :     Case No. 08-14197 (JMP)
                        Debtor.                 :
------------------------------------------------------x

**RESPONSE OF WILLKIE FARR & GALLAGHER LLP TO OBJECTION AND RESPONSE OF THE UNITED STATES TRUSTEE TO FINAL FEE APPLICATIONS**

Willkie Farr & Gallagher LLP ("WF&G"), counsel to the debtor in the above-captioned case and its former debtor affiliates (each, a "Debtor" and collectively, the "Debtors"), hereby submits this response (the "Response") to the objection and response [Docket No. 1208] (the "Objection") of the United States Trustee for the Southern District of New York (the "UST") to the final fee applications (the "Applications") of the professionals (the "Professionals") retained in the Debtors' chapter 11 cases. In support of the Response, WF&G respectfully represents:

**PRELIMINARY STATEMENT**[1]

1. The Objection misconstrues the applicable standards governing approval of professional compensation and reflects the UST's fundamental misunderstanding of the facts and circumstances of the Debtors' cases. Throughout these cases, the UST has expressed skepticism regarding the feasibility of the Plan; specifically, the Debtors' ability to fund payments to their administrative expense and priority creditors and provide for distributions to general unsecured creditors. Now, notwithstanding this Court's prior determination that the Plan is feasible, and the fact that the Debtors are outperforming the projections submitted to the Court

---

[1] Capitalized terms used in this section that have not been previously defined have the meanings ascribed to such terms below.

in connection with the Plan, the UST is attempting to re-litigate the issue of feasibility in connection with the Applications. As the UST has repeatedly been informed, the truth is that the Debtors will have sufficient cash to fund such projected distributions to creditors <u>even if the Debtors never recover a penny from their ongoing actions</u>, which include hundreds of unresolved preference actions that are anticipated to yield significant incremental value. Thus, the current financial position of the Debtors' estates belies the UST's rehashed Plan feasibility argument. In any event, it would be inappropriate, and a dangerous precedent in large chapter 11 cases, to suggest that all retained professionals should be required to <u>guarantee</u> the distributions projected in a debtor's disclosure statement.

2. The UST also takes the absurd position that the modest distributions to general unsecured creditors under the Plan render the Professionals' requested compensation unreasonable. In addition to lacking any basis in the Bankruptcy Code, Bankruptcy Rules, or applicable case law, the UST's position ignores the impressive results that were achieved by the Debtors and the Professionals in these cases. The Debtors commenced their chapter 11 cases in the midst of a financial and economic crisis and were forced to liquidate their inventory during one of the worst retail seasons in history and market their leases in one of the worst real estate downturns in history. Given the substantial challenges the Debtors faced in these cases, the fact that the Debtors are able to achieve administrative solvency and provide <u>any</u> distribution to general unsecured creditors is a testament to the extraordinary efforts of the Debtors and the Professionals to recover and monetize assets of the Debtors' estates and reduce claims against the Debtors to appropriate levels.

3. Additionally, the UST has raised specific objections with respect to WF&G's Application. First, the UST asserts that certain time entries of WF&G professionals

fail to comply with the Guidelines. WF&G has clarified the entries specifically identified by the UST in the Objection, and is willing to clarify any other entries that the UST believes are non-compliant with the Guidelines. Second, the UST objects to reimbursement of certain local meal and transportation charges that the UST asserts are unreasonable in light of the amount of time the applicable WF&G professionals devoted to matters pertaining to the Debtors on the days on which the charges were incurred. By objecting to these expenses, the UST is urging the Court to adopt a rule that is neither provided for by the Guidelines nor consistent with WF&G's firm policy regarding allocation of such expenses. The Court should decline to permit such a result.

4. Notably, the UST's Objection was the only objection submitted in respect of any of the Applications. For the foregoing reasons, the Objection must be denied.

## BACKGROUND

5. On October 26, 2008 (the "Petition Date"),[2] each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Prior to the Effective Date (as defined below), each of the Debtors operated its business and managed its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner was or has been appointed in any of the Debtors' chapter 11 cases.

6. On November 3, 2008, the UST appointed an official committee of unsecured creditors (the "Committee"). On December 16, 2008, and on April 21, 2009, the UST amended its appointment of the Committee.

7. On March 23, 2010, the Debtors filed the First Amended Joint Plan of Liquidation for Value City Holdings, Inc. and Its Affiliated Debtors [Docket No. 1056] (as

---

[2] Two of the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code on October 27, 2008. These entities are Retail Ventures Jewelry, Inc. and VCHI Acquisition Co.

modified, amended, and supplemented, the "Plan") and related disclosure statement [Docket No. 1057] (the "Disclosure Statement"). On May 17, 2010, the Plan was confirmed [Docket No. 1121] (the "Confirmation Order"). The Plan was consummated on June 10, 2010 (the "Effective Date").

8. Pursuant to the Confirmation Order, the chapter 11 cases of each of the Debtors other than Value City Holdings, Inc. were closed as of the Effective Date.

9. On July 16, 2010, WF&G filed its Application [Docket No. 1181] seeking final allowance of $3,590,662.50 in fees and $100,846,07 in reimbursable expenses. On August 24, 2010, the UST filed the Objection.

**ARGUMENT**

A. The UST's Reliance On General Unsecured Creditor Recoveries To Establish That The Professionals' Fees Are Unreasonable Is Misplaced.

10. In the Objection, the UST proposes a reduction of the Professionals' fees by ten percent, or in the alternative to "hold back" ten percent of the Professionals' requested fees until distributions to unsecured creditors are made. See Objection at ¶¶ 20-21. As support for the requested reductions and/or holdbacks, the UST makes much of the fact that general unsecured creditors of the Debtors have not yet received any distributions. Despite the fact that the UST specifically identifies only minor points of objection with respect to certain of the Applications, and raises no issues at all with respect to others, the UST urges the Court to find that aggregate professional fees of $7 million are *per se* unreasonable in a case where unsecured recoveries are less than one percent. The UST cites no authority supporting this proposition.

11. The reasonableness of professional fees is governed by section 330 of the Bankruptcy Code. Section 330(a)(1) provides, in relevant part:

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing . . . the court may award to a . . . professional person employed under section 327 or 1103 –
>
>> (A) reasonable compensation for actual, necessary services rendered by the . . . professional person, or attorney and by any paraprofessional person employed by such person; and
>>
>> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1). Section 330(a)(3) provides, in relevant part:

> (a)(3) In determining the amount of reasonable compensation to be awarded to a . . . professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
>> (A) the time spent on such services;
>>
>> (B) the rates charged for such services;
>>
>> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under [the Bankruptcy Code];
>>
>> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed;
>>
>> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>>
>> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under [the Bankruptcy Code].

11 U.S.C. § 330(a)(3). Notably, the relevant factors listed in section 330 do not include creditor recoveries, nor has the UST identified any case in which a court relied upon creditor recoveries as a significant factor in determining the reasonableness of a professional's requested compensation.

12. The lack of authority supporting the UST's position is unsurprising, for if courts were to look to creditor recoveries as an important factor weighing on the reasonableness of professional fees, competent professionals would be discouraged from taking challenging cases, such as the Debtors' cases, in which substantial professional time and energy are required simply to put the debtor in a position to achieve confirmation of a chapter 11 plan. Such a result would not be consistent with the purposes of section 330 and the other provisions of the Bankruptcy Code relating to professional retention: to ensure that qualified professionals are willing to provide services in bankruptcy cases. See, e.g., In re Drexel Burnham Lambert Group, 133 B.R. 13, 20 (Bankr. S.D.N.Y. 1991) ("Congress' objective in requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists") (internal citation omitted).

13. One need not look further than the Debtors' cases for evidence that the recoveries ultimately realized by creditors are poor metric for evaluating the "success" of a chapter 11 case. The Debtors' cases were commenced under extremely difficult circumstances – a complete chain-wide liquidation during one of the worst retail seasons, and one of the worst real estate downturns, in history. The modest recoveries for general unsecured creditors contemplated by the Plan should not be used to undermine the tremendous efforts of the Professionals, over the course of nearly twenty months, to assist the Debtors in recovering significant value for distribution to the Debtors' estates. As the Court is aware, the Debtors' estates teetered on the brink of administrative insolvency for months, as the Professionals worked together to reconcile claims, recover assets of the estate and ensure the Debtors' ability to pay all administrative and priority creditors in full under the Plan. It is nothing short of remarkable that the Debtors, after liquidating their inventory during one of the worst retail

seasons in history, were able and continue to recover sufficient assets to confirm the Plan. The efforts of the Professionals made that success possible.

14. The UST also ignores the fact that many of the Debtors' trade creditors and former employees, who would typically comprise a substantial portion of the general unsecured creditor constituency, hold administrative expense or other priority claims against the Debtors, all of which are being paid in full under the Plan. Specifically, the Debtors are paying or have paid: (a) over $1.9 million in claims arising under section 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims"), and (b) approximately $2.4 million in priority wage claims to former employees (the "Priority Wage Claims"). Thus, the modest recoveries provided for general unsecured creditors under the Plan must be viewed in context; two of the largest general unsecured creditor constituencies, i.e., employees and trade creditors, are already realizing substantial recoveries under the Plan in the form of allowed 503(b)(9) Claims and allowed Priority Wage Claims.

15. The UST's reliance on general unsecured creditor recoveries to justify reductions to or holdbacks of the Professionals' fees is both unsupportable as a matter of bankruptcy law and misplaced under the circumstances of these cases, in which the fact that unsecured creditors are recovering anything is a testament to the extraordinary results achieved by the Professionals.

B. **The UST's Requests To Reduce And/Or Hold Back The Professionals' Fees Are Inappropriate Under The Circumstances.**

16. The UST's requests to reduce and/or hold back the Professionals' compensation are unjustified under the circumstances of these cases. This is not a case in which there is a substantial risk that <u>administrative</u> creditors may not recover the full value of their claims, in which it might be appropriate for a bankruptcy court to consider holding back all or a

portion of a professional's requested interim compensation.  See In re Goody's Family Clothing, Inc., 392 B.R. 604, 616 (Bankr. D. Del. 2008) (observing that "courts will not compel payment of administrative claims where there is a substantial risk of insolvency"); In re Nana Daly's Pub, Ltd., 67 B.R. 782, 787 (Bankr. E.D.N.Y. 1986) ("Where there are insufficient funds or unencumbered assets in the debtor's estate so as not to warrant the payment of interim allowances and where the debtor has not yet proposed a plan of reorganization, the payment of attorney's fees is appropriately deferred to the conclusion of the case."); In re Western Farmers Ass'n, 13 B.R. 132, 136 (Bankr. W.D. Wash. 1981) ("When there is the possibility that the assets of the estate will not be sufficient to cover all expenses of administration, it is legally improper to pay one expense of the debtor or debtor-in-possession before paying another, except those incurred in the ordinary course of the debtor-in-possession's business operation.").

17. Moreover, consummation of the Plan occurred just over two months ago. Nothing in the Plan or elsewhere requires general unsecured creditors to receive distributions within the first 60 to 90 days of the case, or, for that matter, prior to any specific deadline.  In cases like the Debtors', in which the debtor's estate is liquidated pursuant to a "pot plan," it is common for distributions to unsecured creditors to be delayed for many months post-consummation, while claims are reconciled and estate assets are monetized.  The fact that distributions to general unsecured creditors have not yet been made is unremarkable, and insufficient to justify the disallowance or withholding of the Professionals' fees.

18. Underlying the UST's requests for reductions and/or holdbacks in respect of the Professionals' fees is the UST's skepticism regarding the feasibility of the Plan, an issue that was decided by this Court months ago.  See Confirmation Order at ¶¶ GG, II.  Although the Professionals should not be forced to re-litigate the feasibility issue, WF&G will address the

UST's feasibility arguments on the merits. It remains true that the Debtors' administrative expense and priority creditors will be paid in full under the Plan, and that general unsecured creditors will receive at least the recoveries contemplated in the Disclosure Statement and Plan. Attached hereto as <u>Exhibit A</u> is an analysis setting forth the estates' funds available for distribution to creditors as of Wednesday, August 25, 2010 (the "<u>Distribution Analysis</u>"), prepared by W. Edward Clingman, Jr., a principal of Clingman & Hanger Management Associates, LLC, the Plan Administrator (as defined in the Plan). The Distribution Analysis shows that the Debtors had $7,084,123.55 in cash on hand as of August 25, 2010. Subtracting from that amount the estimated expenses of case administration, estimates of allowed and unpaid administrative and priority claims, and the estimated reserves for disputed administrative and priority claims leaves the estates with $6,977.00 for distribution to general unsecured creditors <u>today</u>. In addition to these funds, the Distribution Analysis indicates that the Debtors have <u>known</u> future cash receipts totaling $1,509,533.00. These receivables, the majority of which relate to tax refunds, are currently due and payable, and are not contingent upon the occurrence of any future events. Upon receiving these funds, the Debtors will have $1,489,592.00 in funds available for emergency use and/or distribution to general unsecured creditors. Notably, this figure <u>does not reflect anticipated recoveries from preference actions that have not yet been resolved</u>, which would further enhance general unsecured creditor recoveries. The estates' current financial position, as illustrated by the Distribution Analysis, demonstrates that the UST's concerns about the Plan's feasibility are unfounded, and that, as of the date hereof, projected recoveries for general unsecured creditors are greater than the recoveries contemplated by the Plan and Disclosure Statement.

19. As further support for the UST's requested reductions and/or holdbacks, the UST implies that the Debtors' cases were administered for the benefit of the Debtors' prepetition secured lenders (the "Lenders") and suggests that the Professionals should have obtained a carve-out from the Lenders' cash collateral to guarantee a distribution to general unsecured creditors. See Objection at p. 1, ¶ 20. Such carve-outs for the benefit of unsecured creditors, or "gifts," are occasionally negotiated in cases in which secured lenders are "underwater" and the debtor has no unencumbered assets available for distribution to unsecured creditors. See, e.g., In re Journal Register Co., 407 B.R. 520, 525 (Bankr. S.D.N.Y. 2009) (in case in which no unencumbered assets were available to distribution to unsecured creditors, plan of reorganization provided for "gift" from secured creditors to unsecured creditors). In contrast, the Debtors' senior secured creditors were paid in full early on in these cases, and the Debtors have since labored to ensure full recoveries for holders of 503(b)(9) Claims and Priority Wage Claims, among others, and to maximize the returns to general unsecured creditors. In that sense, these cases were significantly more "successful" than many recent large chapter 11 cases, and the UST's suggestion that the Debtors' former secured creditors should have funded the Debtors' cases is anomalous at best.

20. Here, the Debtors and the Committee (and their respective Professionals) approached the Debtors' cases with the assumption that general unsecured creditor recoveries would be achievable and worked at all times to maximize such recoveries. In furtherance of that goal, following a thorough examination of the validity of the Lenders' liens by the Committee, the Debtors satisfied all of the Debtors' obligations to the Lenders under their prepetition and postpetition financing facilities, which totaled approximately $34 million, in order to allow for the termination of such facilities. That the Debtors were able to satisfy their secured obligations

in full distinguishes the Debtors' cases from those run primarily for the benefit of secured creditors, in which such a payoff would be impossible. Accordingly, the UST's criticism of the Professionals for not extracting a "gift" from the Lenders is misguided.

21. Finally, in the aggregate, the fees requested by the Professionals in the Debtors' cases are modest in comparison to the aggregate amounts of fees approved on a final basis in chapter 11 cases of comparable size and duration. See, e.g., See, e.g., In re Midway Games, Inc., Case No. 09-10465 (KG) (Bankr. D. Del. Aug. 11, 2010) (in case lasting approximately 16 months, aggregate professional fees of $9,373,460.20 approved); In re Linens Holdings Co., Case No. 08-10832 (CSS) (Bankr. D. Del. June 16, 2010) (in case lasting approximately 21 months, aggregate professional fees of $15,520,512.45 approved); In re BSCV, Inc. (f/k/a Boscov's, Inc.), Case No. 08-11637 (KG) (Bankr. D. Del. Dec. 14, 2009) (in case lasting approximately 13 months, aggregate professional fees of $8,019,484.80 approved).

22. For the foregoing reasons, the UST's requests to reduce and/or hold back the Professionals' requested compensation are inappropriate under the circumstances of the Debtors' cases, and should be denied.

C. WF&G-Specific Billing Issues.

(1) *Allegedly Vague and/or Lumped Time Entries*

23. The UST asserts that certain of the time entries of WF&G Professionals are vague and/or inappropriately "lumped" and, therefore, do not comply with the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (the "UST Guidelines"). See Objection at ¶ 23. The UST provides only five examples of such entries, which represent a total of 4.2 hours of attorney time having a total value of $3,201.00 (the "Specified Entries").

24. In an effort to clarify the Specified Entries and resolve the UST's objection thereto, WF&G has revised the Specified Entries. The revised Specified Entries are attached hereto as <u>Exhibit B</u>. If the UST believes additional time entries by WF&G professionals require clarification, WF&G will work with the UST to provide such clarification.

(2) *Local Meal/Transportation Expenses*

25. The UST also asks the Court to deny reimbursement of $20,792.41 in local meal and transportation expenses incurred by WF&G professionals. The UST asserts that "a professional is not entitled to car service or a meal if that professional is working a few hours on the Debtors' case or on non-emergency matters," and identifies four instances in which WF&G professionals or paraprofessionals charged car service or taxi expenses or local meals to the estate after billing less than six hours on matters relating to the Debtors' cases that day.

26. The UST's objection to the transportation and local meal charges has no basis in the UST Guidelines or the Administrative Order re: Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, dated April 19, 1995 (the "<u>SDNY Guidelines</u>" and, together with the UST Guidelines, the "<u>Guidelines</u>"). Neither the UST Guidelines nor the SDNY Guidelines require that a professional work a minimum number of hours on a debtor's matter as a prerequisite to charging a local meal or car service to such debtor's estates. The UST Guidelines contain no specific restrictions on local meal or transportation expenses. The SDNY Guidelines provide, in relevant part:

> The reasonable expenses of a professional required to work on the case after 8:00 p.m. are reimbursable provided that, if the professional dines before 8:00 p.m., the expense is reimbursable only if the professional returns to the office to work for at least one and one-half hours. In any event, the expense for an individual's meal may not exceed $20.00.

SDNY Guidelines at § F.5. The SDNY Guidelines are silent with respect to local transportation expenses.

27. WF&G has endeavored to comply with the Guidelines at all times. To that end, WF&G has reallocated to a holding account $1,947.31 in local meal expenses, which expenses exceeded the $20 per meal limit established by the SDNY Guidelines. For the UST to seek to impose additional, *ex post facto* limitations on WF&G's entitlement to expense reimbursement is fundamentally unfair.

28. The restriction on local meal and transportation expenses that the UST seeks to impose is also at odds with WF&G's policies regarding such expenses. Regarding local meals, WF&G's policy manual (the "Policy Manual") provides, in relevant part:

> If an attorney works until 8:00 p.m. or later on a regular business day or for at least four hours on the weekend, the attorney may charge the actual cost of his or her meal (not in excess of a reasonable amount) to the client for whom the work is being done.

Similarly, the Policy Manual permits attorneys working past 9:00 p.m. on weekdays or more than four hours on a weekend day on a client's matters to charge taxi or car service expenses to such client. The Policy Manual contains no express requirement that an attorney work a certain number of hours on a specific matter in order to charge local meal or transportation expenses to a client.

29. Moreover, it is simply unfair to suggest that if a professional works for multiple clients in one day, he or she should not be permitted to charge otherwise allowable, late-night meal and travel expenses to any client. Yet this is the implication of the UST's argument.

30. WF&G's policies regarding reimbursement for local meals and transportation are premised on the notion that if a professional is required to stay at the office late into in the evening in order to work on a specific client's matter, such client should be responsible for such professional's reasonable meal and transportation expenses. This approach is both practical and equitable. Although it may have been the case, in some instances, that a

5814183.3

WF&G professional billed meal or transportation charges to the Debtors despite spending the a portion of his or her day working for other clients, it is just as likely that, in other instances, the professional, after spending his or her daytime hours working for the Debtors, charged meal or transportation expenses to another client on whose matter the professional happened to be working at night. In the Objection, the UST fails to recognize this possibility.

31. The UST's request for disallowance of WF&G's local meal and transportation expenses is unsupported by the Guidelines, inconsistent with WF&G's internal policies, and is based on an attempt to create an impractical and inequitable new rule, of which WF&G had no notice. For these reasons, the UST's request must be denied, and WF&G's request for reimbursement of its local meal and transportation expenses should be allowed as set forth in WF&G's Application.

## **CONCLUSION**

WF&G respectfully submits that the compensation and expense reimbursement for which WF&G seeks final allowance in its Application are "reasonable" within the meaning of section 330 of the Bankruptcy Code. Accordingly, WF&G respectfully requests that the Court (a) overrule the Objection; (b) allow, on a final basis, the compensation and expense reimbursement requested in WF&G's Application; and (c) grant such other or further relief as may be just or proper.

Dated: New York, New York
August 30, 2010

WILLKIE FARR & GALLAGHER LLP

By: /s/ John C. Longmire
John C. Longmire
(A Member of the Firm)
Lauren C. Cohen
Andrew D. Sorkin
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Attorneys for the Debtors*